UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

   - against -

HENRY SIMMONS,

               Defendant.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
18-CR-45 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

    Defendant Henry Simmons is charged in a one-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Simmons now moves 1) to suppress the firearm and his two post-arrest statements as fruits of an unlawful seizure of his person and 2) to suppress the statements as the products of custodial interrogation undertaken prior to the administration of *Miranda* warnings. (Mot. to Suppress Tangible Evid. & Statements (Doc. No. 18); Suppl. Mot. to Suppress Custodial Statements (Doc. No. 23).)

    The Court held a hearing on Simmons' suppression motions on October 19, 2018. The only witness produced at the hearing was Police Officer Nicholas Smith of the New York City Police Department. The Court credits Smith's testimony in its entirety. For the reasons set forth below, the Court denies Simmons' suppression motions in all respects.[1]

### I.     Findings of Fact

    On the evening of January 10, 2018, Smith and his partner, Police Officer Joseph Reyes, were assigned to an anti-crime unit in the 75th Precinct, located in East New York, Brooklyn.

---

[1] The government no longer seeks to introduce at trial one statement made by Simmons, rendering moot as portion of Simmons' supplemental motion. *See* Gov't Post-Hearing Br. (Doc. No. 36) at 8.

(Tr. 26–27, 31). The officers were patrolling in an unmarked car and in plainclothes. (Tr. 31–32, 44). Smith was wearing his shield on a chain around his neck. (Tr. 35).

At approximately 9:30 p.m., Reyes was driving west on Glenmore Avenue, a one-way street, with Smith in the front passenger seat. (Tr. 33, 36). As the car approached Van Siclen Avenue, Smith spotted Simmons and another man walking west on the sidewalk nearest to him. (Tr. 33–34). Although it was nighttime and there were cars parked between Smith and the men, Smith could see them clearly by the light of a nearby building. (Tr. 36–37). Smith noticed that Simmons had a marijuana cigarette in his hand. (Tr. 39).

As Smith watched him through the passenger window of the slow-moving car, Simmons lit the cigarette, inhaled, and exhaled. (Tr. 34–35). To Smith, who had received training on how to recognize marijuana, the distinctive smoke emanating from the cigarette was further evidence that it was, in fact, marijuana. (Tr. 28, 34). Smith knew that smoking marijuana on the street was "still a crime," but usually just warned or admonished those he observed committing that offense. (Tr. 34).

Smith told Reyes to stop the car. (Tr. 35). Through the passenger-side window, Smith addressed Simmons "in a way to just break his chops," saying something to the effect of: "[Y]ou're going to light weed right in front of the policeman? Like, come on." (Tr. 35). The man with Simmons "kind of laughed it off" and looked contrite, but Simmons "kind of froze and looked extremely nervous." (Tr. 34).

In light of Simmons' reaction, Smith decided to investigate further and started to exit the car. (Tr. 34–35). When Smith opened the car door, Simmons threw the cigarette to the ground and ran east on Glenmore Avenue. (Tr. 35–36). Smith yelled at him to stop, but Simmons continued running to the end of the block, where he turned left onto Hendrix Street. (Tr. 37–38).

2

As Smith pursued Simmons on foot, he smelled the distinctive odor of marijuana which confirmed his suspicion that Simmons had been smoking marijuana. (Tr. 36). In addition, the way Simmons ran – as if "he was trying to hold on to something with his arms" – heightened Smith's suspicion that he might be armed. (Tr. 39).

Smith chased Simmons one block north on Hendrix Street, then west on Liberty Avenue. (Tr. 37–38.) Reyes pursued Simmons in the car. (Tr. 37). As Simmons approached the corner of Liberty and Van Siclen Avenues, Reyes drove past him and turned left onto Van Siclen, blocking Simmons' path. (Tr. 38). This maneuver forced Simmons to double back towards Smith. (Tr. 38, 64–65).

As he abruptly changed directions, Simmons either stumbled or slipped on some ice on the ground. (Tr. 38, 62). At that point, something "heavy" and "metallic" "fell from his person." (Tr. 38). Smith, still approximately 30 to 40 feet away, did not see what fell. (Tr. 38, 63). However, having heard his colleagues drop their guns on occasion and being familiar with the sound of a gun striking the ground, he believed that Simmons had dropped a firearm. (Tr. 38).

Unsure if Simmons had managed to retrieve the object, Smith drew his own gun and ordered Simmons to lie on the ground. (Tr. 39). When Simmons complied, Smith re-holstered his weapon and handcuffed Simmons. (Tr. 39–40). As he was placing Simmons in handcuffs, Smith asked why he was running if he was only in possession of marijuana. (Tr. 40–41). Although Smith described his inquiry as an "almost talking to myself question," (Tr. 66), Simmons responded by stating that he was on parole. (Tr. 40). Smith replied that they "could have worked it out" had Simmons only been on parole, but that the situation had now "gone to a different level." (Tr. 41).

3

Smith could not recall whether Reyes alerted him to the presence of a gun before, during, or after he handcuffed Simmons, and could not recall whether he asked the question before he learned of the gun. (Tr. 68). However, Smith testified that Simmons had been "under arrest for maybe a second" before he asked the question. (Tr. 68). Smith could not recall asking any other questions thereafter. (Tr. 42).

After Simmons was handcuffed and after Reyes recovered the gun and informed Smith of that fact, Smith and Simmons waited for his supervisor to respond to the scene with another unit. (Tr. 41, 69). Smith was not questioning or talking to Simmons and described "the situation … [as] calm at that point." (Tr. 69). Since the officers had no intention of questioning Simmons, they did not read him the *Miranda* rights. (Tr. 41).

While they were standing there in silence, Simmons asked Smith if somebody had called 911 or otherwise alerted the officers to the fact that he had a gun. (Tr. 41, 69). Smith estimated that Simmons asked the question less than five minutes after Smith had asked Simmons why he ran. (Tr. 69). However, Smith could not recall exactly how much time had elapsed. (*Id.*)

After placing the handcuffed Simmons in the back of a patrol car, Smith and other members of the anti-crime unit searched the area where Smith had first seen Simmons. (Tr. 71). Although they "canvassed that area for quite some time," they never recovered the marijuana cigarette. (*Id.*) Smith noted that the man who had been walking with Simmons remained in that area while the officers pursued Simmons. (*Id.*) Although that individual later came to the location where Simmons had been arrested, (Tr. 66), Smith assumed that the man "probably … had picked up whatever was thrown to the floor." (Tr. 71).

## II. Conclusions of Law

### A. The Motion to Suppress Tangible Evidence and Statements

In his Motion to Suppress Tangible Evidence and Statements, Simmons argues that the warrantless seizure of his person violated the Fourth Amendment, and that both the firearm recovered by Reyes and the statements Simmons made to Smith should be suppressed as fruits of that Fourth Amendment violation. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Because arrests are "seizures" of "persons," they must be reasonable under the circumstances. *District of Columbia v. Wesby*, 138 S. Ct. 577, 585–86 (2018) (citing *Payton v. New York*, 445 U.S. 573, 585 (1980)). A warrantless arrest is reasonable if the officer has probable cause to believe that the suspect committed a crime in the officer's presence. *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001).

"Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243–44, n.13 (1983).

In deciding whether probable cause exists, courts assess "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Ackerson v. City of White Plains*, 702 F.3d 15, 19–20 (2d Cir. 2012), as amended (Dec. 4, 2012). "Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *Id*. at

584, n.2 (citing *Devenpeck v. Alford*, 543 U.S. 146, 153–55 & n.2 (2004). "[A]n arresting officer's state of mind does not factor into the probable-cause inquiry, 'except for *the facts* that he knows.'" *Heien v. North Carolina*, 135 S. Ct. 530, 543 (2014) (quoting *Devenpeck*, 543 U.S. at 153 (emphasis added in *Heien*)).

In this case, Simmons contends that he was seized as soon as Smith initiated the chase. The Court disagrees. For Fourth Amendment purposes, seizure "requires *either* physical force ... *or*, where that is absent, *submission* to the assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original). The word "seizure" does "not remotely apply … to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee." *Id.* Moreover, pursuit by officers "does not even implicate the Fourth Amendment." *Bartels v. Schwarz*, 643 F. App'x 54, 57 (2d Cir. 2016) (summary order).

In this case, Simmons was not seized until sometime after he complied with Smith's order to lie on the ground.[2] By that time, Smith had already observed the following. First, from the passenger seat of the unmarked car, he observed Simmons carrying what he believed, based on his training in identifying drugs, to be marijuana. Second, after Simmons lit the cigarette and exhaled, Smith observed the distinctive smoke which, again based on his training, he associated with marijuana. Third, as he began to chase Simmons, Smith smelled "very distinctly the odor of marijuana." (Tr. 36). Although the marijuana was never recovered by the police, the Court agrees with Smith that there was a "high probability" that Simmons' companion – who remained in the area where Simmons disposed of the cigarette after both officers departed – disposed of the evidence.

---

[2] As explained below, Smith's actions in forcing Simmons to the ground and handcuffing him are not inconsistent with a *Terry* stop. Smith, who believed Simmons may have dropped and recovered a firearm during the chase, was entitled to take these actions for his own safety.

6

These observations alone gave Smith probable cause to believe that Simmons had committed the offense of criminal possession of marihuana in the fifth degree, a class B misdemeanor. A person commits that offense "when he knowingly and unlawfully possesses … marihuana in a public place, as defined in [New York Penal Law] section 240.00 … and such marihuana is burning or open to public view …." N.Y. Penal Law § 221.10(1). Section 240.00(1) defines the term "public place" to mean "a place to which the public or a substantial group of persons has access." A sidewalk is a location within the definition of Penal Law § 240.00(1). *People v. Afilal*, 26 N.Y.3d 1050, 1052 (2015).

Simmons' seizure was also justified on grounds separate and apart from Smith's observations of Simmons' use of marijuana. Before he drew his gun and ordered Simmons to the ground, Smith had at a minimum reasonable suspicion – if not, probable cause – to believe that Simmons was in possession of a firearm outside of his home or place of business, in violation of New York Penal Law § 265.03(2).

Even before Smith began to chase him, Simmons engaged in nervous and evasive behavior. First, when Smith made his comments about Simmons lighting a marijuana cigarette in front of the officers, Simmons "kind of froze and looked extremely nervous." (Tr. 34). Second, when Smith – his shield prominently displayed on a chain around his neck – exited his car with the intention of engaging Simmons in further conversation, Simmons fled the scene.[3]

It is well recognized "that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (citing cases). Moreover, "[h]eadlong flight – wherever it occurs – is the consummate act of evasion." *United States v.*

---

[3] Indeed, nothing in the record supports Simmons' argument that Simmons fled because he did not know that Smith and his partner were police officers.

7

*Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006) (quoting *Wardlow*, 528 U.S. at 124). While flight "is not necessarily indicative of wrongdoing, … it is certainly suggestive of such." *Id*.

During the chase, Smith made further observations which gave him reasonable suspicion that Simmons might be in possession of a gun. First, Simmons ran as if "he was trying to hold on to something with his arms." (Tr. 39). Simmons also changed direction several times, including doubling back to avoid apprehension by Reyes. The Second Circuit has recognized that actions taken to evade apprehension can serve to corroborate prior observations and to provide an "objective manifestation that criminal activity was afoot." *Muhammad*, 463 F.3d at 123.

Finally, when Simmons changed directions to avoid Reyes, something "heavy" and "metallic" "fell from his person." (Tr. 38). Although Smith did not see what fell, he was familiar with the sound of a gun striking the ground and believed that Simmons had dropped a firearm. These observations, considered in their totality, gave Smith probable cause to believe that Simmons had committed the crime of criminal possession of a weapon the second degree in violation of New York Penal Law § 265.03(3) by possessing a loaded firearm somewhere other than in his home or place of business.

At a minimum, these observations gave rise to a reasonable suspicion that Simmons possessed a gun, and Smith's actions were reasonable under the Fourth Amendment. To be sure, "[u]nder ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop." *United States v. Vargas*, 369 F.3d 98, 102 (2d Cir. 2004) (quoting *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001)). However, this police conduct "is not an arrest 'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.'" *Id*. Since Smith was unsure whether Smith had managed to retrieve the gun after slipping, Smith

was entirely justified in stopping Simmons at gunpoint and handcuffing Simmons for his own safety.

Although it is unclear whether Reyes alerted Smith that he had recovered a gun before Smith handcuffed Simmons, it is clear that Reyes imparted this information, at the latest, within moments after the handcuffing occurred. At that point, Smith certainly had probable cause to arrest Simmons not only for possession of marijuana but for criminal possession of a weapon in the second degree.

Accordingly, Smith's decision to effect a warrantless seizure was reasonable. *See Atwater*, 532 U.S. at 354. Since the Fourth Amendment prohibits only "unreasonable searches and seizures," Smith's actions did not violate the Fourth Amendment. Accordingly, Simmons' motion to suppress on Fourth Amendment grounds the tangible evidence recovered by Reyes and the statements Simmons made to Smith is denied.

**B. The Supplemental Motion to Suppress Custodial Statements**

In his Supplemental Motion to Suppress Custodial Statements, Simmons argues that the statements he made to Smith were fruits of a custodial interrogation undertaken without first administering the warnings required in *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court recognized that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. "To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused." *Moran v. Burbine*, 475 U.S. 412, 420 (1986). "If a suspect is not provided with *Miranda* warnings, 'the

prosecution is barred from using statements obtained during the interrogation to establish its case in chief.'" *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009) (quoting *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004)).

"*Miranda*'s warning requirements, however, apply only to 'custodial interrogation.'" *Id*. (quoting *Newton*, 369 F.3d at 669). To constitute "custodial interrogation," "(a) there must be an interrogation of the defendant, and (b) it must be while she is in 'custody.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "[S]pontaneous statements which are not the result of 'official interrogation' have never been subject to [*Miranda*'s] strictures." *Wolfrath v. LaVallee*, 576 F.2d 965, 973 n.6 (2d Cir. 1978).

The government no longer seeks to introduce at trial Simmons' first statement, rendering moot this prong of Simmons' supplemental motion. The government maintains, however, that the second statement was spontaneous and should not be suppressed. The Court agrees with the government.

While Smith should have known that his question, even if meant to be rhetorical, was likely to elicit an incriminating response, he asked only a single question. By the time Simmons made his second statement, the men had been standing in silence for up to five minutes, waiting for Smith's supervisor to arrive. All was calm, and Smith was not even talking to Simmons, much less interrogating him. Rather, it was Simmons who chose to interrogate Smith, seeking information from the officer regarding what caused him to suspect that he had a gun. From these

facts, the Court concludes that the second statement was spontaneous, and not a product of custodial interrogation. Accordingly, Simmons' supplemental motion to suppress custodial statements is denied with respect to Simmons' second statement.

## CONCLUSION

For the reasons set forth herein, Simmons' motions to suppress tangible evidence and statements (Doc. Nos. 18 and 23) are denied.

SO ORDERED.

Dated: Brooklyn, New York  
       November 20, 2018

*Roslynn R. Mauskopf*

_____  
ROSLYNN R. MAUSKOPF  
United States District Judge